**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JOHN A. RICE,**

      **Plaintiff,**

**v.**                                      **Case No.: 3:17-cv-02083**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 10, 13).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED;** the Commissioner's

request for judgment on the pleadings be **GRANTED;** the Commissioner's decision be **AFFIRMED;** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On March 12, 2013 and January 30, 2015, respectively, Plaintiff John A. Rice ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of December 1, 2012, (Tr. at 285, 321), due to "loss of eyesight, heart murmor [sic], depression [and] heart issues." (Tr. at 333). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 161, 167). Claimant filed a request for an administrative hearing, which was initially held on November 25, 2014, before the Honorable Robert M. Butler, Administrative Law Judge (the "ALJ"). (Tr. at 106-134). During the hearing, the ALJ determined that a review of additional medical records concerning Claimant's alleged impairments of chest pain, migraine headaches, depression, and vision issues was required prior to rendering a decision. (Tr. at 130-34). Consequently, a supplemental hearing was held on June 4, 2015. (Tr. at 29-94). By written decision dated August 17, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 11-22). The ALJ's decision became the final decision of the Commissioner on January 27, 2017 when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 7, 9). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 10) and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 13). Therefore,

the matter is fully briefed and ready for resolution.

## II.    **Claimant's Background**

Claimant was 41 years old at the time that he filed the application for DIB benefits and 43 years old at the time he filed the application for SSI benefits and on the date of the ALJ's decision. (Tr. at 11, 285, 321). He did not complete high school, but does communicate in English. (Tr. at 332, 334). Claimant previously worked as a laborer, grocery stock clerk, and blacktop sealer. (Tr. at 118-20, 334).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d),

416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2012. (Tr. at 13, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since December 1, 2012, the alleged disability onset date. (Tr. at 13, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "chronic obstructive pulmonary disease, metabolic syndrome, hyperlipidemia, migraines, obesity, coronary artery disease,

4

osteoarthritis of the bilateral shoulders, loss of visual acuity, anxiety disorder, and depressive disorder." (Tr. at 13-14, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 14-16, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) consisting of lifting up to 20 pounds occasionally and 10 pounds frequently, standing and walking for about 6 hours and sitting for up to 6 hours, with an 8-hour workday, with normal breaks. The claimant is able to perform work that does not involve concentrated exposure to extreme heat, chemicals, poorly ventilated areas, and environmental irritants such as fumes, odors, dusts and gases. The claimant is able to perform work that does not involve even moderate exposure to unprotected heights or use of moving machinery. The claimant is limited to occupations, which do not require more than frequent near and far acuity. The claimant is able to understand, remember and carry out simple instructions, make judgments on simple work related decisions, interact appropriately with supervisors and coworkers in a routine work setting, and respond to usual work situations and no changes in a routine work setting.

(Tr. at 16-20, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 21, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 21-22, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1971, and was defined as a younger individual age 18-44 on the alleged disability onset date; (2) he had a limited education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because Claimant's past relevant work was unskilled. (Tr. at 21, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined

5

that Claimant could perform jobs that existed in significant numbers in the national economy, including work as a cashier, fast food worker, and merchandise marker at the unskilled, light exertional level. (Tr. at 21-22, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 22, Finding No. 11).

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant raises one challenge to the Commissioner's decision. Claimant contends that the ALJ erred when disregarding testimony by the vocational expert in which she opined that an individual would not be employable if he needed to miss more than one day of work per month and was off task more than 15% of a work day. According to Claimant, his frequent chest pain and migraine headaches would invariably cause him to exceed those parameters. (ECF No. 10 at 5-6).

In response, the Commissioner argues that there is no medical support for Claimant's allegation that he would miss more than one day of work per month and would be off task in excess of 15% each work day. (ECF No. 13 at 10-15). Moreover, the Commissioner points out that the vocational expert's testimony was not specific to Claimant; rather it was offered as a generality. The Commissioner adds that the testimony was not in response to a hypothetical question that accurately reflected Claimant's RFC; accordingly, the ALJ had no obligation to give the testimony any evidentiary weight.

## V.    Relevant Evidence

The undersigned has reviewed all of the evidence before the Court. The following evidence is most relevant to the issues in dispute.

### A. Treatment Records

On September 16, 2010, Claimant presented to Cabell Huntington Hospital with

6

complaints of chest pain. (Tr. at 588-99). Claimant reported a past medical history of hypertension and hyperlipidemia. He underwent cardiac stress testing in 2006, which revealed ST depressions during exercise; however, follow-up imaging did not show any reversible defects. Claimant indicated that he had no problems thereafter until recently when he began to experience intermittent chest pressure that radiated to his left neck and shoulder, along with mild shortness of breath. Claimant admitted to smoking two and one-half packs of cigarettes per day for the past twenty-six years. He was employed laying blacktop. On examination, Claimant was alert and oriented and walked unassisted. His pupils were round and equal; his heart rate and rhythm were regular with no murmur, rub, or gallop; his lungs were clear; he had a full range of motion in his extremities with 5/5 muscle strength throughout. Laboratory tests showed normal cardiac enzymes. A chest x-ray revealed a normal-sized heart and clear lungs, with no evidence of acute cardiopulmonary disease. (Tr. at 604). However, an EKG indicated a septal infarct with an incomplete, right bundle branch block, similar to one seen on a prior EKG of Claimant taken in 2009. Dr. James Perry was consulted to perform a cardiology evaluation of Claimant. (Tr. at 595-97).

On cardiac examination, Dr. Perry noted a systolic murmur of Claimant's heart, positive at S1 and S2. An EKG revealed Q-waves in V1, V2 and V3. Dr. Perry diagnosed Claimant with atypical, asymptomatic chest pain. He offered treatment options of a left heart catheterization or stress test. Claimant opted to undergo a stress test. Resting images were performed, but the second half of the test was delayed at Claimant's request. He asked to be discharged, so the remainder of the test was scheduled for a later time on an outpatient basis. At discharge, Claimant was strongly encouraged to stop smoking.

On September 20, 2010, Claimant underwent the remainder of the stress testing

under the direction of Dana Ellen, M.D. (Tr. at 510-11, 614-16, 756-61). Based on data and images from a nuclear myocardial perfusion study, Dr. Ellen concluded that Claimant had normal myocardial perfusion on nuclear scan images and normal left ventricular systolic function with an ejection fraction of 73%. Nonetheless, the results of an exercise stress test were positive, revealing horizontal ST depression in II, III measuring one millimeter as well as a ventricular fibrillation, although Claimant did not experience angina during the test. His Duke treadmill score was +4. (Tr. at 512-13).

On September 27, 2010, Claimant presented to Dr. Scott Davis at Valley Health for follow-up care. (Tr. at 696).Claimant denied chest pain, but had some shortness of breath. His medication regimen included Lopressor twice daily, as well as aspirin and Pravastatin. Claimant weighed 255 pounds, and his blood pressure was 126/85. His physical examination was unremarkable. Because Claimant's stress test was positive, Dr. Davis advised him to continue taking his medications and to refrain from any physical activity or exertion until he was re-examined by a cardiologist. (Tr. at 695-96). Dr. Davis provided Claimant with a work excuse, citing a positive stress test and the need for a heart catheterization procedure. Claimant was told not to return to work until he obtained cardiac clearance. (Tr. at 507).

On October 12, 2010, Claimant was seen by Melissa Lester, D.O., for a cardiology consultation. (Tr. at 504-06). Claimant complained of pressure and shortness of breath with exertion. He reported a history of a positive EKG during stress testing. On examination, Claimant weighed 238.8 pounds, had a blood pressure of 125/78, and an oxygen saturation level of 99% on room air. The remainder of Claimant physical examination was unremarkable. In view of Claimant's positive stress test, Dr. Lester discussed with him the benefits of a heart catheterization and percutaneous

8

revascularization, if indicated on catheterization. Claimant elected to undergo the procedure.

A few days later, on October 15, Claimant underwent a left heart catheterization, selective coronary angiography, and left ventriculography by hand injection. The results showed no significant coronary artery disease and normal left ventricular systolic function. (Tr. at 502-03, 756-57). Based on these results, Dr. Lester recommended aggressive risk factor modifications. She also planned to consider other potential causes of Claimant's reported chest pain. In follow-up to the procedure, from November 11 through December 13, 2010, Claimant wore an event monitor. (Tr. at 495-500). The results showed only one recording that was at baseline, which was sinus tachycardia with rates up to 117 beats per minute; however, no arrhythmias were noted. During this period, Claimant was released to return to work by Dr. Lester. (Tr. at 501).

On February 7, 2011, Claimant presented to Dr. Scott Davis complaining of left shoulder pain located on the superior aspect of the shoulders bilaterally and over the AC joints. Claimant also complained of muscle pain on the left side. (Tr. at 693-94). On examination, Claimant had tenderness to palpation and nodularity over the left AC joint; however, he had a full range of motion to the shoulder joint with no sign of impingement. Claimant complained of pain at the AC joint with crossover. Dr. Davis diagnosed Claimant with left AC joint osteoarthritis. He provided instructions for home exercise and stretching to help ease the pain and gave Claimant a prescription for Motrin. To control his hypertension, Claimant was advised to continue taking Lopressor. He was also told to continue Pravastatin for hyperlipidemia, which appeared to be stable.

Claimant returned to Dr. Davis on July 13, 2011. (Tr. at 691). Claimant continued to complain of shoulder pain, reporting that Motrin relieved it somewhat. Dr. Davis

documented that Claimant was non-compliant with physical therapy. Claimant had no other complaints. His physical examination was unremarkable, and his hypertension was noted to be well controlled. Dr. Davis diagnosed Claimant with right acromioclavicular joint pain and hypertension and instructed him to continue taking the prescribed medications and do home exercises and stretching.

On November 5, 2011, Claimant presented to Cabell Huntington Hospital's emergency room with complaints of low back pain that started two weeks prior while Claimant was at work shoveling blacktop. (Tr. at 630-38). On examination, he had tenderness to the right, lateral lumbar spine. Scoliosis was noted; however, Claimant's straight leg raise test was normal. He also had a normal range of motion and strength. Claimant was assessed with back pain and provided Flexeril. He was advised to follow-up with his primary care physician, was provided a work excuse, and was discharged in stable condition.

On June 4, 2012, Claimant saw Dr. Davis for complaints of migraine headache. (Tr. at 412, 682). Claimant told Dr. Davis that this was the third such headache he had experienced after spending several hours in the sun laying blacktop at work. Claimant denied having an aura, dizziness, vision changes, numbness, or weakness. Dr. Davis diagnosed Claimant with a migraine headache and provided prescriptions for Toradol and Promethazine. Claimant returned to Dr. Davis on June 28, reporting that Toradol had helped relieve the migraine pain after three days. (Tr. at 409-10, 680-81). Claimant had no current symptoms or problems. Claimant denied chest pain, palpitations, syncope, or edema. Dr. Davis documented that Claimant had lost seven pounds since his last visit, although he continued to struggle with weight loss and continued to "smoke heavily." (Tr. at 409). On examination, Claimant weighed 235 pounds. He was alert, oriented, and in

no acute distress. His cardiac examination was normal, and his lungs were clear. Claimant's extremities were unremarkable, with +2 distal pulses and no sign of edema. Dr. Davis diagnosed Claimant with metabolic syndrome X,[1] hypertension, migraines, depression, and anxiety. He advised Claimant to "continue aggressive attempts of weight loss and exercise," in addition to "strongly" advising Claimant to stop smoking and adopt "healthy behavior." (*Id.*). Claimant responded that he was not "mentally ready to set a quit date for smoking." (*Id.*). He was given medication for treatment of migraines, Celexa and Vistaril for treatment of depression and anxiety, and told to continue his hypertension medications as they were controlling his blood pressure well.

Claimant returned to Dr. Davis on February 27, 2013 for complaints of lingering cough and right-sided pain after having the flu. (Tr. at 461-66). Claimant weighed 249 pounds and appeared in no acute distress. He continued to smoke one pack of cigarettes per day. Dr. Davis diagnosed Claimant with bronchitis and pleurisy versus costochondritis. He gave Claimant a written order for a chest x-ray and prescribed an antibiotic, prednisone, and a cough medication. Two months later, on April 23, Claimant followed-up with Dr. Davis, still complaining of cough and left rib pain. (Tr. at 458-560). Dr. Davis diagnosed Claimant with bronchitis, documenting that a chest x-ray had been ordered for Claimant one month earlier, but he failed to get it done. Claimant was given prescriptions for Prednisone and Cipro.

Claimant went to the emergency room at Cabell Huntington Hospital on January 7, 2014 with complaints of chest pain that began three days earlier and was becoming

---

[1] Metabolic syndrome, also called syndrome X, is the name for a group of risk factors that raises an individual's risk for heart disease and other health problems. *See* National Heart, Lung and Blood Institute, National Institutes of Health, U.S. Department of Health and Human Services, Bethesda, MD at www.nihlbi.nih.gov/health-topics/metabolic-syndrome.

progressively worse. (Tr. at 658-70). Associated symptoms included shortness of breath; post-nasal drainage; mild, generalized muscle aches; and mild productive cough. Dr. Everett Wray conducted an ECG study, with the results revealing sinus rhythm, right ventricular conduction delay, and an old anterior septal myocardial infarction. (Tr. at 493-94). A chest x-ray was negative for acute disease process. (Tr. at 663, 670). Claimant was assessed with bronchitis, was provided prescriptions for Prednisone and Albuterol, and was discharged.

Claimant returned to Dr. Davis on March 10, 2014 for routine health maintenance. (Tr. at 451-54, 490-92). Dr. Davis noted that Claimant, who had not followed-up in more than a year, continued to smoke daily, had poor exercise habits, and had not seen his cardiologist as recommended. Claimant denied vision problems, chest pain and heart palpitations, dyspnea, orthopnea, headache, and cough. Claimant stood at five feet, six inches and weighed 257 pounds with a blood pressure of 137/85. A depression screen was conducted. Claimant scored a 1, indicating symptoms that occurred once a week in the form of feelings of hopelessness, depression, anhedonia and little pleasure in doing things. Claimant was diagnosed with coronary artery disease that was stable, essential hypertension, and depression. As Claimant reported that Celexa eased his depression, Dr. Davis provided a prescription for that medication, along with a referral to a cardiologist.

On April 8, 2014, Claimant presented to Dr. Melissa Lester after a three and one half-year gap for management of chest pain, palpitations, chest pressure, and edema. Claimant's review of systems was negative. (Tr. at 472-75, 482-85). On examination, Claimant walked with a normal gait and station; his mood and affect were normal; he had no heart murmurs or thrills; his carotid pulses were normal at 2+ bilaterally; and his muscle strength and tone were normal. Dr. Lester diagnosed Claimant with obesity, prior

myocardial infarction, edema, hyperlipidemia, and systemic essential hypertension. She ordered an echocardiogram of Claimant's heart, which was completed on April 21. The study showed that Claimant's right ventricular systolic pressure, left ventricular systolic function, and left ventricular filling pressure were normal. (Tr. at 479-80, 766-67). A nuclear stress test was also performed and revealed normal myocardial perfusion, a positive ECG interpretation, and normal stress ejection fraction of 71%. (Tr. at 765).

Dr. Lester next examined Claimant on July 2, 2014 for the chief complaint of edema. (Tr. at 469-71). Claimant denied any current symptoms. He continued to smoke daily. Claimant weighed 255 pounds, and his blood pressure was 126/79. Claimant's physical and psychological examinations were normal. Dr. Lester diagnosed Claimant with acute bronchitis and placed him on Amoxicillin. He was told to return in one year.

On October 23, 2014, Claimant presented to David Whitmore, D.O., with complaints of chest congestion and productive cough along with facial pain and swollen eyes. (Tr. at 447-49). Dr. Whitmore documented that Claimant smoked one pack of cigarettes a day; had poor exercise habits; and was employed as a maintenance worker. On examination, he had sinus tenderness, nasal discharge, rhonchi, and subtle expiration wheeze in the lungs; however, his cardiac examination was normal. Dr. Whitmore diagnosed Claimant with acute sinusitis and bronchitis. Claimant recieved prescriptions for Cephalexin, Promethazine, and Prednisone.

The following month, on November 8, Claimant underwent a chest x-ray at Cabell Huntington Hospital. (Tr. at 446, 617). The x-ray revealed normal heart and lungs with stable pleural thickening laterally on the right. No acute infiltrates were seen. Two days later, on November 10, Claimant returned to Dr. Davis with complaints of an upper respiratory infection. (Tr. at 441-44). Dr. Davis noted that Claimant was morbidly obese

with a history of fatigue and daily headaches in addition to having a poor diet and being non-compliant with smoking cessation. As for symptoms of depression, Claimant was not taking the medications prescribed for that condition. On examination, auscultation of Claimant's lungs revealed audible wheezing and prolonged expiratory time; however, there were no rales or crackles. Claimant's cardiac examination was normal; he denied chest pain or discomfort. Dr. Davis diagnosed Claimant with sinusitis, for which a steroid taper and Augmentin were prescribed, and chronic obstructive pulmonary disease for which Wellbutrin was prescribed in an effort to assist with smoking cessation. An obstructive sleep apnea study was scheduled. Claimant was advised to stop smoking and was continued on Vistaril for treatment of symptoms of depression and anxiety.

On February 15, 2015, Claimant was examined by Dr. Nick Weber at Sam's Optical Club. Claimant reported being "blind in right eye" secondary to a high fever he had in childhood. (Tr. at 774-75).  On examination, Claimant's extraocular movements were within normal limits. Without correction, his near vision in the left eye measured 20/200. Dr. Weber did not make any notation as to the right eye measurement in the medical record. Claimant was assessed with presbyopia and provided a prescription for glasses.

Claimant was examined on April 6, 2015 by Dr. Davis. (Tr. at 798-801). Claimant needed refills of his prescriptions. He denied experiencing any adverse side effects from his medications and also denied having headaches, vision problems, or chest pain; however, Claimant continued to have a "nagging" productive cough and wheezing. Dr. Davis confirmed that Claimant continued to smoke cigarettes and was not using his inhalers. Claimant weighed 260 pounds and had a blood pressure of 124/62. On examination, Claimant's heart rate and rhythm were normal, and no murmurs were noted. He demonstrated lung auscultation abnormalities in the form of wheezing and

prolonged expiratory time, but no rales or crackles were detected. Dr. Davis diagnosed Claimant with essential hypertension and chronic obstructive pulmonary disease. As Wellbutrin had failed to stop Claimant from smoking, Dr. Davis prescribed Proair HFA. Claimant was once again counseled on the need to stop smoking. Dr. Davis had previously ordered an obstructive sleep apnea study, but Claimant failed to attend the scheduled study. Therefore, Dr. Davis discussed with Claimant the importance of compliance and the need for treatment. Along with medication, Dr. Davis advised Claimant to follow a low sodium diet, stop smoking, and initiate a regular exercise program.

On June 17, 2015, Claimant returned to Dr. Davis with complaints of left-sided pain secondary to chronic coughing. (Tr. at 794-97). Claimant also complained of headache related to sinus pain, nasal congestion, productive cough, dyspnea, wheezing and decreased appetite. Claimant weighed 264 pounds with a blood pressure of 124/77. He admitted to smoking cigarettes every day. Claimant's physical examination findings were unchanged from his last visit, and a depression screening was negative. Dr. Davis diagnosed Claimant with acute bronchitis. Claimant received prescriptions for Azithromycin and Prednisone, along with an order for a chest x-ray. Dr. Davis also discussed the need for smoking cessation.

On June 22, 2015, Claimant was was seen by Terry Roberts, APRN, and reported that he felt "a little better," although his cough had not improved. (Tr. at 791-93). Claimant had not finished his course of steroids, having five more days to complete. He told Nurse Roberts that he felt a "catch" that caused severe pain in the left side of his upper abdomen and lower ribs in addition to coughing more at night. Although he was beginning to feel better since starting antibiotics and steroids, he reported that he had canceled the scheduled sleep study, because he did not feel well enough to attend. On

examination, Nurse Roberts detected bilateral wheezing and rhonchi, which improved when Claimant coughed. His heart rate, rhythm, and sounds were normal with no murmur. Claimant's capillary refill test was normal, and he had no evidence of edema. Nurse Roberts assessed Claimant with acute bronchitis, obesity, unspecified muscle strain in the left lower rib area, and nicotine dependence. Claimant was provided a prescription for Amoxicillin and advised to stop smoking.

### B. Opinion Evidence

On May 10, 2013, Thomas Lauderman, D.O., completed a physical residual functional capacity assessment at the request of the SSA. (Tr. at 149-50). Dr. Lauderman did not find Claimant to have any exertional, postural, manipulative, visual, or communicative limitations. As for environmental limitations, Dr. Lauderman opined that Claimant had unlimited capacity to tolerate exposure to extreme temperatures, wetness, humidity, noise, vibrations, fumes, odors, dusts, gases, and poor ventilation; however, he needed to avoid concentrated exposure to hazards, such as machinery or heights. On August 8, 2013, Narendra Parikshak, M.D., completed a physical residual functional capacity assessment on reconsideration. (Tr. at 157-59). Dr. Parikshak indicated she had reviewed all of the medical evidence, noting there were no new records to suggest any change in Claimant's functional limitations. Based upon her review, Dr. Parikshak affirmed Dr. Lauderman's findings as written.

On May 11, 2013, Debra Lilly, Ph.D., reported that she was unable to complete a psychiatric review technique, because there was no evidence of a mental health diagnosis. (Tr. at 148). On August 9, 2013, Holly Cloonan, Ph.D., completed a case analysis, indicating that while Claimant had received some treatment for anxiety and depression from his primary care physician, the medical evidence was insufficient to assess

16

Claimant's mental impairments. (Tr. at 156).

On January 27, 2015, Claimant's cardiologist, Dr. Melissa Lester, completed a medical assessment of Claimant's ability to do work-related activities–physical. (Tr. at 768-70). Dr. Lester did not find Claimant limited in his ability to lift, carry, stand, walk, or sit. Dr. Lester opined that Claimant could frequently climb, balance, stoop, crouch, kneel, and crawl. In addition, she found that Claimant had no restrictions in reaching, handling, feeling, pushing, pulling, seeing, hearing or speaking and no environmental restrictions. Dr. Lester also answered some written questions posed by Claimant's attorney. (Tr. at 771-72). Dr. Lester indicated that Claimant's subjective complaints of pain and fatigue were not consistent with objective medical findings, noting that both his echocardiogram and nuclear stress test results were normal. She opined that Claimant could engage in employment eight hours per day, five days per week, on a consistent basis. Moreover, she did not believe that Claimant had any other impairments related to cardiovascular disease that limited his ability to work.

### C. Claimant's Statements

In an Adult Function Report prepared in April 2013, Claimant stated that he wakes up in the morning, takes his medications, and then usually spends the day sitting at the kitchen table. (Tr. at 345). He indicated that he has trouble sleeping due to migraines. Claimant can prepare simple meals for himself and mows the lawn every two weeks in the summer. (Tr. at 346). Claimant goes out two or three days per week and drives occasionally, but only when he is not having eyesight issues. (Tr. at 347). As far as hobbies, Claimant watches television daily and visits the park with his family about once per month. He has trouble concentrating, so he does not follow written instructions well, but he does follow spoken instructions. (Tr. at 349). Claimant stated that he gets stressed

easily, but can handle changes in his routine. (Tr. at 350).

At his first administrative hearing held in November 2014, Claimant testified that he has troubled seeing out of his right eye and experiences frequent migraine headaches. He indicated that he is prescribed ibuprofen for his pain. (Tr. at 129-30). At the second hearing in June 2015, Claimant testified that he had breathing difficulties and was trying to stop smoking by chewing gum when he has a craving. (Tr. at 44). Claimant stated that he drives twice per week on the country roads near his house, but avoids main roads due to his eyesight. (Tr. at 45). He indicated that his depression and anxiety makes him nervous around other people and he feels panicky when in a car. He also feels anxious when his four children are rambunctious and loud in the house. (Tr. at 47). Claimant testified that he often feels tired, and his fatigue is exacerbated by heat. In the summer, he tries to mow the yard with a push mower, but his oldest son usually has to finish the job. (Tr. at 53-54). Claimant complained of having chest pain and shoulder discomfort, in additional to the migraine headaches, and the pain from these conditions required him to take ibuprofen 800. (Tr. at 56-58). Claimant described having trouble walking uphill, and stated that he is only able to carry items that are not heavy; such as, a gallon of milk or a carton of cola. During the day, Claimant watches television and frequently sits on the front porch. (Tr. at 60). He fixes light meals for himself when he is alone. With respect to social activities, Claimant stated that he goes to church occasionally (Tr. at 62). Claimant testified that he is not able to return to work, because of his headaches, fatigue, poor vision, and chronic bronchitis. (Tr. at 67-68).

## VI.    **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial

evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the United States Court of Appeals for the Fourth Circuit defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

Claimant argues that the ALJ erred by not accepting an opinion from the vocational expert regarding Claimant's ability to work if he were absent more than one day per month and/or were off task more than fifteen percent of the work day. The undersigned **FINDS** Claimant's argument to be entirely without merit for the simple reason that neither of these limitations were included, or should have been included, in Claimant's RFC finding.

It is well established that for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's

impairments. *Walker v. Bowen,* 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into a RFC finding that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart,* 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 Fed. Appx. 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted). When a vocational expert's testimony is based on a proper hypothetical question and is consistent with the Dictionary of Occupational Titles, the ALJ may afford significant weight to the opinion. In contrast, the ALJ is never required to accept a vocational expert's opinion that is not supported by a proper hypothetical question, because an opinion that is not based on a claimant's individual limitations is not relevant to the disability finding.

Here, the ALJ presented numerous hypothetical questions to the vocational expert, including a hypothetical scenario that incorporated all of the limitations contained in Claimant's RFC finding. Despite these limitations, the vocational expert identified jobs that an individual like Claimant would be capable of performing. While the vocational expert separately discussed the extent to which employers would tolerate absenteeism and lack of concentration on the part of employees, that testimony was not in response to ***any*** hypothetical question setting forth Claimant's limitations. (Tr. at 83-84). Instead, the testimony was offered by the vocational expert in response to general inquiries posed by the ALJ. Given the context of the opinions, the ALJ was not required to consider them

20

in reaching the disability determination.

Although he does not explicitly assert error in the RFC finding, Claimant implies that the RFC finding was inadequate because it did not contain limitations related to absenteeism and being off task. Claimant asserts, without support, that his headaches, chest pain, and other impairments would "obviously" result in absenteeism and lack of concentration in amounts exceeding the parameters outlined by the vocational expert; therefore, these functional consequences should have been included in the RFC finding and hypothetical questions. (ECF No. 10 at 5-6). Claimant's contention is unpersuasive, because the record clearly does not support his factual premise.

As the ALJ points out in the written decision, Claimant had a longstanding history of headaches, which predated the alleged disability onset date. Nevertheless, Claimant received minimal treatment over the years and was never referred to, nor consulted with, a neurologist. (Tr. at 19). The ALJ noted the lack of consistent complaints of headache in the medical record, concluding that headaches must not have significantly affected Claimant's daily functioning, or he would have been more persistent in presenting symptoms to his treating physicians. (*Id.*). Consequently, the evidence does not corroborate the persistence or severity of headache pain suggested by Claimant.

In regard to Claimant's chest pain, the ALJ discounted Claimant's allegations of disabling symptoms, citing to medical records reflecting a stable cardiac condition. (Tr. at 18). The ALJ discussed Claimant's cardiac test results performed in 2010, which showed normal ventricular functioning and no significant coronary artery disease. In addition, Claimant denied palpitations, chest pain, and edema on multiple office visits. In April 2014, after an extended gap in treatment, Claimant returned to his cardiologist, Dr. Lester, who ordered follow-up cardiac testing. (Tr. at 18-19). Although an EKG showed

21

some abnormality, a myocardial perfusion study was normal, as was Claimant's ejection fraction.

Equally as important as the objective records demonstrating a stable cardiac condition, Dr. Lester completed an RFC assessment in January 2015, which did not support a finding that Claimant suffered from a disabling cardiac impairment. To the contrary, Dr. Lester opined that Claimant's heart condition did not affect his ability to lift and carry; did not affect his ability to stand and walk; did not affect his ability to sit; did not significantly limit his postural activities; did not affect his ability to reach, handle, feel, push, pull, see, hear, or speak; and did not result in any environmental limitations. (Tr. at 768-70). Indeed, Claimant's treating cardiologist found absolutely no functional limitations flowing from Claimant's heart condition. (*Id.*). When asked by Claimant's attorney if Claimant's subjective complaints of pain and fatigue were consistent with the objective clinical findings, Dr. Lester answered in the negative, explaining that Claimant's echocardiogram and nuclear stress tests were normal. (Tr. at 771). Dr. Lester opined that Claimant was capable of working at gainful employment eight hours per day, five days per week, and had no cardiac-related impairments that limited his ability to work. (Tr. at 771-72).

In view of the objective medical records, the gap in treatment, the inconsistent medical complaints, and the medical source opinions, the ALJ correctly determined that Claimant's symptoms of pain and fatigue did not interfere with his ability to work on a full-time basis. Moreover, this evidence entirely supported the ALJ's conclusion that Claimant's impairments would not lead to excessive absenteeism or prolonged episodes of being off task. Given that the evidence of record substantiates the ALJ's RFC finding and does not support Claimant's suggested limitations, and further considering that the

vocational expert identified jobs that Claimant was capable of performing even when taking into account his RFC finding, the ALJ's determination of non-disability is supported by substantial evidence and should be affirmed.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding United States District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 10); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be

provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  March 28, 2018

Cheryl A. Eifert
United States Magistrate Judge

24